Filed 6/21/23  P. v. Cortijo CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

'IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>DEANGELO CORTIJO,<br><br>    Defendant and Appellant. | A162926<br><br>(Alameda County<br>Super. Ct. No. 16CR012117) |

Defendant DeAngelo Cortijo was convicted of the second-degree murder of Jamad Jerkins, together with a firearm enhancement.  We reversed that conviction, finding that the trial court committed reversible error by failing to grant a mistrial due to the admission of hearsay evidence that undermined certain defense theories.  (*People v. Cortijo* (dec. Mar. 6, 2020, A154579) [nonpub. opn.].)

Defendant, representing himself, was retried and was again convicted of second-degree murder (Pen. Code,[1] § 187, subd. (a)), together with a true finding on a firearm enhancement allegation (§ 12022.53, subd. (b)).  The court sentenced defendant to the maximum aggregate term of 25 years to life, consisting of 15 years to life for the murder conviction plus a consecutive

---

[1]     All undesignated statutory references are to the Penal Code.

1

term of 10 years for the firearm use enhancement. (§§ 190, subd. (a), 12022.53, subd. (b).)

On appeal, defendant requests a new trial and resentencing based on a variety of arguments. He also challenges an April 20, 2021 order denying a request for disclosure under section 745, known as the California Racial Justice Act of 2020.

We affirm the judgment of conviction. We reverse the April 20, 2021 order and on remand direct the trial court to reconsider the request for disclosure consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The fatal shooting took place at approximately 10 p.m. on October 24, 2016 in the parking lot of an apartment complex.

According to the prosecution, the evidence at trial established the victim was leaving the parking lot when defendant, armed with a loaded gun, confronted the victim, and told him to leave the area. When the victim did not leave, defendant came closer and pointed the gun, with his finger on the trigger, within inches of the victim's face, causing the victim to instinctively push the gun away and downward. Defendant, still firmly holding the gun, fired a shot striking the victim in his abdomen. The prosecutor argued defendant was guilty of murder under an implied malice theory, and that the evidence dispelled any claims that the shooting was either justifiable homicide or an accidental discharge that happened when the victim pushed the gun away.

According to defendant, the shooting was not murder as he did not act with the necessary malice aforethought. He contended his traumatic childhood and mental health issues had heightened his fear of the much larger aggressive victim, that when the victim took a swing at him defendant

2

pointed his loaded revolver at him, and that when the victim slapped the gun down, the gun discharged striking the victim.

*Prosecution Case at Trial*

A "grainy" surveillance camera video captured some of the actions of defendant and the victim before, during, and after the shooting. The jury viewed both the original surveillance video and two enhancements of the video. The prosecution also presented witnesses who were present in the area at the time of the shooting: T.R.[2], A.G., C.S., and P.T.

T.R. testified that she had been dating the victim, and he had been staying in the living room of an apartment belonging to defendant's older sister P.O.

On the evening of October 24, 2016, T.R. drove the victim to P.O.'s apartment so that he could stay the night and get his work clothes for the next day. Between 9:30 p.m. and 9:55 p.m., the victim apparently unsuccessfully attempted to gain entry to P.O.'s apartment. The victim sent a text message to T.R., told her something was wrong, and asked T.R. to pick him up at the apartment complex. When T.R. arrived, she texted the victim to let him know she was there.

At 9:53 p.m., A.G. and C.S. saw the victim sitting on the bench in front of P.O.'s apartment and talking on his cell phone. According to A.G., the victim was acting normal and calm and had nothing in his hands (no weapons, gun, knife) except the telephone. A.G. got into the driver's seat of her car and continued her conversation with C.S. A.G. saw defendant exit the sliding door to P.O.'s apartment, hop over the patio balcony wall, and walk into the parking lot.

---

[2]    We use initials to protect certain individuals' privacy interests. (Cal. Rules of Court, rule 8.90(b)(10).)

3

Both A.G. and C.S. saw defendant approach and start speaking with P.T. in the parking lot. Defendant was rambling and P.T. heard defendant say something to the effect of " 'He's cookies,' " which P.T. understood as meaning defendant "wants to like harm somebody." C.S. heard defendant say, "I'm going to pop" the victim, which C.S. understood as meaning "someone was going to shoot someone."

At about 9:50 p.m. T.R. saw defendant as he appeared from an unknown location on the other side of the parking lot. The victim was walking toward T.R.'s car with nothing in his hands when defendant stopped the victim and shot him. The victim's body dropped to the ground. T.R. did not hear anybody say anything before the gunshot, but afterwards she heard defendant say something like, "Get outta here," as defendant stood over the fallen victim. T.R. screamed for the victim to get up because she thought defendant was going to shoot him again.

A.G. saw defendant walk over to the victim, who was standing about two to three feet from her car. The victim turned but did not move in defendant's direction, made no quick movements, did not attempt to hit defendant, and had nothing in his hands. Defendant said something to the victim, lifted a silver revolver in his right hand, and pointed it at the victim's face with his right arm extended. Without making any aggressive move, the victim said, "Come on, bro," and used his open palm to push the gun away from his face and downward toward his stomach. About two seconds later, A.G. saw fire come out of the revolver when defendant shot the victim, who then collapsed to the ground. Standing over the collapsed and bleeding victim, defendant said, "Get up outta here." Defendant's voice was aggressive, he looked angry, and he was firmly holding the gun. The victim grabbed his side, stood up, and ran to a vehicle where a woman (T.R.) was

4

yelling for the victim to get up and get into her car. The victim got into the car and the car drove away. Defendant then went and got into a car with P.T.

P.T. saw defendant walk over to the victim, intersect his path, and angrily yell at him, including "Get outta here." Defendant pulled out a silver revolver and pointed it at the victim's face or chest, telling him to leave. The victim did not have a gun and was not doing anything aggressive. The men were talking and the victim said, " 'Man, stop playin.' " The victim put up his hands with his palms open facing away from his chest area, like he was trying to avoid getting shot by blocking the gun. The victim never tried to punch or hit defendant. Then defendant shot the victim, who crumpled to the ground. Defendant continued to talk to the victim, who managed to get up while holding himself, walked to a waiting car, and got inside and the car drove away.

The prosecution presented evidence that the victim died of a gunshot wound to the abdomen. At his death the victim weighed 200 pounds and stood 6 feet 2 inches tall, while T.R. testified defendant stood approximately 5 feet 5 inches tall. The police never recovered defendant's gun, but the prosecution presented a firearms expert who determined that the bullet that struck the victim was likely from a 9 mm Luger cartridge usually fired from a semiautomatic pistol, that could also be fired from a revolver using a moon clip (a device for holding cartridges). Assuming the bullet was fired from a moon clip holding five cartridges from a revolver without an exposed hammer, the revolver was most likely a Smith and Wesson model 940. Such a double-action revolver would typically have a trigger pull of 10 to 14 pounds and would be unlikely to discharge inadvertently unless the person holding the firearm had their finger on the trigger.

*Defense Case at Trial*

The events leading up to the shooting were testified to by defendant and his older sister P.O.

P.O. and the victim had been in a relationship and lived together in P.O.'s apartment, but by the time of the shooting they had broken up and the victim had moved out. Before the breakup, the victim and P.O. had a heated argument and the victim had attempted to physically assault P.O. Defendant knew about P.O's argument with the victim. P.O. confirmed that after her argument with the victim, they continued to be friends.

On the day of the shooting, the victim had arranged with P.O. that he would come over and leave some items in the apartment. When P.O returned home, the victim was not there but he had apparently come to the apartment and left a bag and clothing on the kitchen table.

At about 7:00 that same evening, defendant arrived at P.O.'s apartment; present at the time were P.O., her three young children, and defendant's teen-aged younger sister and her friend. Defendant knew the victim had previously dated P.O. but believed they were no longer together. Defendant was afraid of the victim but did not expect the victim to come the apartment that night and did not want any problems with him.

After defendant arrived at P.O.'s apartment, she left for a movie date with her new boyfriend. She told defendant to keep the doors locked and to not let anyone in. P.O. did not say anything about the victim. At about 9:30 p.m., while P.O. was at the movies, the victim and P.O. exchanged several text messages in which the victim informed P.O. that he needed access to the apartment and had made several unsuccessful attempts to reenter the apartment (the door was locked). P.O. did not text or try to reach defendant regarding the victim's request to enter the apartment.

6

Defendant was not aware of the text messages between P.O. and the victim. He testified that he and the children were sleeping in various bedrooms by about 9:30 p.m. At some point, defendant heard knocking on the front door. As the knocking continued, defendant became terrified, walked into the kitchen, and got his loaded revolver. The person at the front door continued to knock and kick at the door for approximately 20 minutes. After the banging and kicking stopped, the person started to pry open the kitchen window. Through the window blinds, defendant recognized that the person trying to enter was the victim, someone he previously knew. Defendant was terrified because he knew the victim was a threat.

After the victim left, without having gained entry into the apartment, defendant went to the outside parking lot area to calm down. Defendant was nervous and had a "rambling" conversation with P.T. for approximately two or three minutes. Defendant asked P.T. if he had seen " 'the guy trying to break into the apartment?,' " and defendant commented that " 'If that dude would have, you know, if he would have [come] in, I would have popped him.' "

While talking to P.T., defendant saw the victim enter the parking lot and walk towards the balcony of P.O.'s apartment. Defendant walked straight toward the victim and came within arm's reach. Defendant pointed with his left hand and told the victim to leave the area, that P.O. did not want him there, and he was not supposed to be there. The victim got angry and aggressive and made a quick action with his right hand, at which time defendant lifted his right hand and pointed his gun upwards towards the victim's facial area. When asked what happened next, defendant said it was just very fast and the victim was shot.

On cross-examination, the prosecutor questioned defendant concerning what he meant by the term " 'cookies.' " Defendant replied that cookies meant something to eat or smoke, and it also meant "harm caused to somebody." The prosecutor then questioned defendant about two phone calls he had made while in jail awaiting trial in this case: a 38-second voicemail message left for his wife and a 90-second telephone call with his mother. In those calls, defendant expressed his anger and disbelief that while he was incarcerated his wife and brother had slept together; he sounded upset and angry, used profanities to describe his wife and brother, and stated " 'it is 'cookies' " apparently referring to his wife (in the voicemail), and " '[i]t's cookies, bud,' " apparently referring to his brother (in the phone call to his mother).

The jury listened to the phone calls and then the prosecution further questioned defendant. He testified that in the voicemail left for his wife he used the term cookies not to mean he wanted to kill her, but that it was "cookies for our relationship. It's over for our relationship. It could be general for a lot of different things. It's not just harm. It's slang." In the call with his mother, defendant confirmed he used the term cookies, and that in "one realm . . . of the term" he used the term when he got mad at someone. Defendant denied that before the shooting he had said that the victim was "cookies," or that he said he was going to " 'pop' " the victim. Defendant averred that he actually said that if the victim had gotten into the apartment then defendant would have " 'popped him.' "

Defendant presented evidence of his life circumstances to explain his response to the situation he faced on the night of the shooting. He described to the jury his traumatic and abusive childhood including periods of foster care, his prior juvenile and adult criminal history, interspersed with

8

completion of high school, attendance at college and completion of paralegal studies, and a few months of employment with lawyers and legal organizations. He also described his mental health, testifying that he had been diagnosed as suffering from Post-Traumatic Stress Disorder (PTSD) and prescribed medication.

Dr. Laeeq Evered, a psychologist, evaluated defendant in the fall of 2020. He reviewed defendant's mental health records, conducted interviews with defendant's family members, and in his expert opinion believed that defendant's reported mental health symptoms met the criteria for a diagnosis of PTSD and major depressive disorder. Evered testified that a person with a history of trauma and abuse and symptoms of PTSD would potentially experience a perceived threat from a person banging on doors more intensely than other people. The fear response could be intensified if the noise lasted for a long period of time, and the person was in an enclosed environment and believed his family was in danger. It could take up to 30 minutes for such a person to recover from this heightened state of fear, and the person could be easily re-triggered by re-seeing the person whom he believed to be a threat within a short period of time even at a distance of 20 feet.

The prosecutor asked Evered if he had been provided with a voicemail that defendant had left for his wife in which defendant had used the term " 'cookies' in an aggressive manner." Evered replied he was not aware of the existence of such a phone call. When asked if such information would have been helpful to him, the witness replied, "Again, any information would be helpful."

Defendant also asked the jury to consider evidence of his character for nonviolence through the opinion testimony of two lay witnesses, an attorney who had formerly represented defendant and employed him, and another

attorney who had formerly employed defendant. Both witnesses testified that during the time they spent with defendant they never knew him to be a violent person. During cross-examination of one of the witnesses, the witness listened to the jail phone calls and testified the calls did not change his opinion that defendant was not a violent person.

The court instructed the jury to consider the offenses of murder in the second degree, voluntary manslaughter (unreasonable self-defense or defense of others, heat of passion, provocation), involuntary manslaughter (criminal negligence), and a firearm use allegation, as well as the concepts of justifiable homicide (reasonable self-defense or defense of others) and excusable homicide (accident). The jury found defendant guilty of second-degree murder and found true the related firearm use allegation.

## DISCUSSION

We commence our discussion by noting the overwhelming evidence supporting the jury verdict. Based on surveillance video, forensic evidence, and testimony of eyewitnesses and an expert criminalist, the prosecution established that defendant walked toward the victim, caught the victim by surprise, and then raised a loaded double-action revolver to within inches of the victim's head. When the victim reacted by pushing the gun out of his face and downward, defendant, with his finger on the trigger, fired the gun and a bullet fatally struck the victim in the stomach.

## I. No Prejudicial Error Based on Admission of Defendant's Jail Phone Calls

The court allowed the prosecutor to play the jail phone calls during defendant's cross-examination and the cross-examination of one of defendant's character witnesses, and a reference was made to a jail phone call during the cross-examination of defendant's expert witness Dr. Evered.

10

Defendant's arguments in support of his contention that reversal is required based on the admission into evidence of his jail phone calls are not persuasive.

We see no merit to defendant's argument that the calls were improperly used to impeach his testimony. Defendant presented evidence of the victim's propensity for violence with testimony that the victim previously had a heated argument with P.O. during which the victim attempted to physically assault her. Because defendant presented evidence of the victim's propensity for violence to show defendant's alleged reasonable response to the victim's violence, the prosecutor was properly allowed to cross-examine the defendant to show defendant's propensity for violence. (Evid. Code, § 1103, subd. (b).; see *People v. Fuiava* (2012) 53 Cal.4th 622, 695–696 [if a defendant offers evidence (in the form of specific instances of conduct) to establish a victim was a violent person, thereby inviting the jury to infer the victim acted violently during the events in question, the prosecution is then permitted to introduce evidence (in the form of specific instances of conduct) demonstrating the defendant was a violent person].)

We also see no merit to defendant's argument that the calls were improperly used to impeach his expert and character witnesses. The expert witness testified that he had examined defendant and drawn certain opinions about his mental health. Hence it was proper for the prosecutor to cross-examine the expert witness "by reference to facts in the record" (*People v. Nieves* (2021) 11 Cal.5th 404, 452) – i.e., defendant's jail phone call to his wife – and ask if such information would have been helpful in forming his expert opinions. Because defendant's character witness offered an opinion of defendant's character for nonviolence, it was proper for the prosecutor to ask whether it would change his opinion if he knew about defendant's potential

11

for violence as evinced by the jail phone calls. (*People v. Hawara* (2021) 61 Cal.App.5th 704, 714; see also *People v. Hempstead* (1983) 148 Cal.App.3d 949, 954 [where a witness is called to express an opinion as to the defendant's character, the prosecution must have an opportunity to let the jury test the validity of the opinion or the weight to be given it by asking whether the witness "has knowledge of events or acts which have indisputably occurred," even if the witness has no knowledge of them].)

Defendant's argument that the calls should have been excluded as unnecessary (and therefore not relevant) because the jury had heard the testimony of P.T. and defendant as to what defendant meant when he used the term " 'cookies' " is not well taken. "Contrary to defendant's claim, evidence does not become irrelevant simply because other evidence may establish the same point." (*People v. Smithey* (1999) 20 Cal.4th 936, 973–974; see *People v. Clark* (2011) 52 Cal.4th 856, 894 [court rejected argument that challenged evidence probative of the defendant's demeanor should have been excluded as " 'wholly unnecessary' " because the prosecutor presented other lay witnesses who described the defendant's demeanor; that the prosecutor could have relied on other testimony and evidence of the defendant's demeanor did not diminish probative value of the challenged evidence or require its exclusion under Evid. Code § 352; "the prosecutor is not required 'to present its case in the manner preferred by the defense' "].)

Defendant's argument that the calls should have been excluded as "profoundly" prejudicial under Evidence Code section 352 also fails. "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice,

confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008.) "In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Id*. at p. 1009.)

We are not persuaded by defendant's speculative argument that it is hard to listen to the calls and not have a visceral response. The two calls, totaling only two and a half minutes, were not likely to so arouse the emotions of the jurors so that they would use the evidence in some manner unrelated to the issues before them. (See *People v. Edelbacher* (1989) 47 Cal.3d 983, 1016.) While the calls were mentioned in the prosecutor's closing, the remarks were brief and properly focused on the juror's consideration of the evidence as corroboration of the testimony of P.T. and defendant and evidence of defendant's intent and character for violence. In rebuttal, defendant specifically addressed the calls by reminding the jurors that they were made at a time when his wife and brother were cheating on him, he was "a man speaking out of hurt and pain," and that his use of the term "cookies" when put into proper context prior to the shooting, was merely him venting to a friend about how he felt when the victim was trying to break-in and there was no future threat in his words.

The evidence of the jail phone calls played a very small role in the context of the prosecution's extensive and strong evidence establishing defendant's guilt. Accordingly, we conclude there was no error in the

13

admission of the calls and any purported error was harmless under any standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [constitutional error]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [state law error].)

## II. No Prejudicial Error Shown Based on Claim that Trial Court Forced Defendant to Prematurely Rest His Case

Defendant argues the trial court committed prejudicial error by forcing him to rest his case without being able to call several witnesses after the court denied him a continuance to recover from physical injuries he allegedly sustained when assaulted by jail staff. We disagree.

### a.    *Relevant Facts*

After the prosecution rested, defendant was given the opportunity to present his case. Over the course of three days, defendant presented his own testimony as well as the testimony of several witnesses, including his older sister P.O., an expert witness on defendant's fear response when faced with a threat, and two character witnesses. On Thursday, May 20, defendant did not appear in court. The court continued the matter and directed defendant's appointed investigator to arrange for two defense witnesses to be present in court on Monday, May 24.

On May 24, defendant was present, and the court noted there were two defense witnesses waiting outside. Outside the presence of the jury, defendant asked for a continuance or a mistrial, asserting that he had been unable to come to court the prior Thursday because he was attacked by jail staff, resulting in injuries to his lungs, rib, and eye. After a lengthy discussion between the court and defendant as to whether defendant's injuries had made him unable to come to court, the court denied defendant's request for a continuance as the court had received information that

14

defendant had been found fit to appear in court but had refused to come to court. The court then turned to a discussion concerning the exhibits to be admitted at trial. When that discussion was completed, the court asked defendant if he had an "offer of proof" as to proposed testimony to be elicited from the two witnesses that were available to testify that day. Defendant said he had no offer of proof as to one witness and made no response as to other witness. Instead, defendant requested a continuance, asking the court for a week or two to allow him to receive medical care so that he would be capable of interviewing and cross-examining witnesses.

The court denied a continuance and explained the history of case, including that defendant had rested his case on two previous occasions but each time the court had allowed defendant to reopen and to continue to present witnesses. After the court noted that the trial proceedings had to be stopped on every day of trial due to defendant's disruptions, the court concluded it appeared that defendant had no further witnesses. In response, defendant said he had witnesses, but he was not prepared to handle an examination at that time due to his recent medical problems and asked for three or four days to see a doctor. The court said it did not believe defendant's representations as to what had occurred in his jail cell and did not respond when defendant asked the court to make an inquiry into the matter. The court denied the request to extend the trial and stated that defendant had run out of witnesses and rested.

When defendant said he was not ready to proceed, the court replied that the trial would proceed and if defendant did not want to participate the court would allow defendant to waive his appearance. Defendant then accused the court of wanting defendant to waive his appearance so that the jury would not hear his side of the story. To which the court replied: "You

15

rest." After further colloquy, defendant informed the court that he would remain in the court and give a closing argument. The court reiterated that defendant had no further witnesses and rested and denied his motion for a continuance. After a recess, the trial resumed. The court instructed the jury, the prosecution and defendant gave closing arguments, and the jury then commenced their deliberations.

### b. Analysis

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] In the exercise of this right, [however], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302.) Defendant claims he was denied the right to present a defense because the trial court abused its discretion in denying his request for a continuance to allow him time to prepare to question the witnesses that were available to testify and to locate and produce other intended witnesses.[3] We see no merit to the claim.

It is well settled that the trial court has broad discretion to determine whether good cause exists to grant a continuance during trial. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1126 (*Barnett*); § 1050, subd. (e).) When a defendant makes a request for a continuance in the midst of trial, the court " 'must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors, and the court, and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " (*People v.*

---

[3]     On appeal defendant does not challenge the trial court's denial of his motion for a mistrial, but only the denial of his request for a continuance.

16

*Zapien* (1993) 4 Cal.4th 929, 972 (*Zapien*), quoting *People v. Laursen* (1972) 8 Cal.3d 192, 204.) "In the absence of a showing of an abuse of discretion *and* prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction." (*Barnett*, *supra,* at p. 1126, italics added.)

Defendant argues the trial court abused its discretion when it failed to give credence to his complaints that his medical condition necessitated a continuance. However, "[t]he motion for continuance created for the court a factual issue – whether the defendant's condition at the time was such as to preclude him from effectively proceeding with his defense; and its determination will not be disturbed unless there appears a clear abuse of discretion." (*People v. Hanz* (1961) 190 Cal.App.2d 793, 796–797.) Here, the court considered a medical report on defendant's condition and the statement of the court's bailiff who reported to the court information received from members of the jail staff. The trial proceeding concerning defendant's request for a continuance covers 23 pages of trial transcript.[4] During that time the trial court "had the opportunity to observe defendant's physical appearance and the manner of his conduct, and to hear him express himself, and any conclusion inferring that defendant's 'condition' was but a ruse to further delay the trial will not be disturbed." (*Id.* at p. 797; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 78 [trial court is in best position to assess a witness's credibility as it can observe the demeanor of a witness].)

---

[4] The first nine pages concern defendant's initial request for a continuance, the next three pages concern defendant's active participation in a discussion concerning the admission of exhibits including defendant's objections to the admission of surveillance camera footage, and the next eleven pages concern defendant's renewed request for a continuance, at the conclusion of which he informed the court that he was prepared to give his closing argument.

We also see no merit to defendant's claim that the trial court abused its discretion because the court knew defendant intended to call additional witnesses, two of whom were present and available. It is well settled that a trial court does not abuse its discretion in denying a motion for a continuance to secure witnesses unless the movant (here defendant) has exercised due diligence to secure the witness's attendance, the witness's expected testimony is material and not cumulative, the testimony could be obtained within a reasonable time, and the facts to which the witness would testify could not be otherwise proven. (*People v. Howard* (1992) 1 Cal.4th 1132, 1171 (*Howard*), disapproved on other grounds in *People v. Rhoades* (2019) 8 Cal.5th 393, 425, fn. 12.) Here, defendant made no offer of proof demonstrating that the facts he expected to prove by the testimony of any available or intended witnesses were material to his defense and would not be cumulative of other evidence. Accordingly, the trial court acted within its discretion in refusing to grant the continuance. (*People v. Doolin* (2009) 45 Cal.4th 390, 451 [no abuse of discretion in denying continuance to interview prospective witnesses where there was no showing movant could produce specific, relevant mitigating evidence within a reasonable time].)

Nor did the court's refusal to grant a continuance deny defendant his federal constitutional right to due process. "[I]t is not every denial of a request for more time that violates due process. . . ." (*Ungar v. Sarafite* (1964) 376 U.S. 575, 589 (*Ungar*).) "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (*Ibid.*) Here, defendant failed to show either in the trial or on appeal that any missing witness "would say something material and helpful to the defense." (*Howard, supra*, 1 Cal.4th at p. 1172.) "Even in a capital case, if the defendant cannot show . . .

that specific witnesses exist who would present material evidence, '[g]iven the deference necessarily due a state trial judge in regard to the denial or granting of a continuance,' the court's ruling does not support a claim of error under the federal Constitution." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1039–1040, quoting *Ungar, supra*, at p. 591 and citing *Howard, supra*, at p. 1172.)

Defendant also argues that even if there were a basis to deny the continuance, his constitutional rights to due process and a fair trial were violated as there was no justification for the court to unilaterally declare that defendant had no further witnesses, rested, and had to make a closing argument without delay. We disagree.

There is no question that "the complete exclusion of evidence intended to establish an accused's defense may impair . . . [the defendant's] right to due process of law." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) But here, "[t]here was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." (*In re Wells* (1950) 35 Cal.2d 889, 894; *id.* at p. 895 ["[p]etitioner is mistaken in his suggestion that the right of jury trial under the Constitution of this state includes the absolute right to have all relevant evidence before the jury in every case"].) Hence, the proper standard of review of the court's rulings is "that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836, . . and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24 . . .)." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) Nonetheless, under either standard of review, defendant's assertion of prejudicial error fails.

Because the record does not disclose the nature of the testimony of the missing witnesses, there is no way to determine whether the proposed

testimony would have "had any bearing upon evidence to be introduced at trial, or otherwise deprived defendant of a fair trial." (*Zapien, supra*, 4 Cal.4th at pp. 972–973.) Therefore, we cannot conclude the testimony of the missing witnesses "would have produced relevant evidence." (*Id.* at p. 973.) On this record, defendant does not demonstrate either a reasonable probability that in the absence of the court's rulings defendant would have obtained a different outcome (*Watson, supra*, 46 Cal.2d at p. 836) or a reasonable possibility that the court's rulings contributed to the jury's verdict (*Chapman, supra*, at 386 U.S. at p. 24).

## III. Reversal Not Required Based on Judicial Conduct

A trial court " ' "commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution" ' [citation]. Nevertheless, ' "[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper and delaying behavior." ' " (*People v. Woodruff* (2018) 5 Cal.5th 697, 768 (*Woodruff*).) Here, we find no misconduct.

Defendant argues he is entitled to a new trial because the court's conduct throughout the trial signaled to the jury that the judge had a low opinion of defendant and found his story less than credible. We have read the comments in context as well as the entirety of the trial transcript and do not recite each instance mentioned in defendant's opening brief "because to be correctly evaluated they must be read in context. Faithful excerption would require the quotation of many pages of transcript." (*People v. Dickenson* (1962) 210 Cal.App.2d 127, 138 (*Dickenson*); see *People v. Sanders* (1995) 11 Cal.4th 475, 532 [" '[t]he propriety and prejudicial effect of a particular

comment [made by a trial court] are judged by both its content and by the circumstances in which it was made' "].)  A fair reading of the record reflects that the trial court's comments were not made "sua sponte" but rather were made in response to defendant's conduct, whether intentional or not, which bordered (if not actually crossed the line into) contemptuous conduct and provoked the court to rebuke him sometimes in an emphatic manner in the presence of the jury.[5]

---

[5] For example, during the cross-examination of a police officer who had investigated the crime scene, defendant sought to question the officer concerning his assignment to the CeaseFire section of the Oakland Police Department.  When the prosecutor objected, the court asked defendant to explain the relevancy of the question, to which defendant replied, the officer's "qualifications," and defendant wanted to know about the program and how it worked because it sounded like a good program.  After the court sustained the objection, explaining that the question concerning the CeaseFire program was not relevant to this murder case, the following colloquy occurred: Mr. Cortijo: "CeaseFire is not relevant to – how is CeaseFire not relevant?"  The Court: "Sustained."  Mr. Cortijo: "You don't want to prevent violence –"  The Court: "Sustained."  Mr. Cortijo: "-- to our young children?" The Court: *"You can't continue to give speeches."* Mr. Cortijo:  "Any ways, thank you, Officer. All right.  Enjoy your day."  (Italics added.)

During the prosecutor's cross-examination of defendant's sister, P.O., the prosecution asked if defendant "only spent one time – the night one time at your home?," to which she replied, "Yes."  Defendant lodged an objection, contending that the prosecutor had misstated the transcript of P.O's testimony at an earlier hearing in which the witness had testified that defendant had stayed at her home overnight on one occasion.  The court's response that defendant would get an opportunity to cross-examine the witness, prompted the following colloquy:  Mr. Cortijo: "Do you like to see me get frustrated your Honor?  Does it please you to see me in pain?"  The Court: "I don't know anything about your pain."  Mr. Cortijo:  "Is that why you like to antagonize me with the D.A.?"  *The Court:  "Mr. Cortijo, you've got to stop giving speeches." Mr. Cortijo: "Yeah." The Court: "What he says is not evidence." Mr. Cortijo: "That's – that's--" The Court: "You can't do it." Mr. Cortijo:  "Ladies and Gentlemen of the jury, what's going on today, is they – they want – they want to antagonize me so you see me -" The Court: "Mr Cortijo." Mr. Cortijo: "—so that you see me, you know – so that you see me as*

21

Defendant makes no separate appellate argument challenging the court's substantive rulings on his evidentiary objections, except concerning the admission of his jail phone calls to his wife and mother, addressed *ante*. "[T]he comments did not rise to the level of 'an unconstitutional display of judicial bias,' but instead amounted to correct rulings . . . accompanied by impatience" at defendant's argumentative and improper remarks. (*Woodruff, supra*, 5 Cal.5th at p. 768.) " '[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.' " (*People v. Snow* (2003) 30 Cal.4th 43, 78.) We cannot so conclude on this record.[6]

---

*an injured person." The Court: "Mr. Cortijo, you've got to be quiet." Mr. Cortijo: "That's why he's doing that. That's why he's doing that." The Court: "Mr. Cortijo, You've got to be quiet." Mr. Cortijo: "Your Honor –" The Court: "You know the rules. You know that." Mr. Cortijo: "I have to be quiet? I have to be quiet? Your Honor." The Court: "You need to let him –" Mr. Cortijo: "You have to be respectful –"* The Witness: "DeAngelo." Mr. Cortijo: " -- and honorable." The Court: "[Trial prosecutor], go head." (Italics added.)

During later cross-examination of defendant's sister, P.O., the prosecutor questioned her concerning the argument she had with the victim before their relationship ended. The following colloquy took place: The Prosecutor: "So it was a heated argument, correct?" The witness: "Correct." Mr. Cortijo: "Does that make it justifiable, Mr. Prosecutor?" The Court: "He's just talking." Mr. Cortijo: "Mr. Law Enforcement Officer. Violence against women is okay?" The Court: *"The record's got to reflect Mr Cortijo continues to have outbursts in the court, give statements, speeches and is disrespectful to the whole process. [The trial prosecutor] is doing his job."* Mr. Cortijo: See, the difference between you and me is I'm free, you Honor. You know what, I'm free." The witness: "DeAngelo." The Court: "Go ahead. [Trial prosecutor], please." (Italics added.)

[6] We are not persuaded by the cases cited by defendant as a reading of the trial transcript in this case does not demonstrate any judicial conduct or

"In weighing the question of reversible error, the most critical circumstance is that the court meticulously avoided expressing any opinion or intimation as to the guilt or innocence of the defendant, and from discrediting any witness for the defense." (*Dickenson*, *supra*, 210 Cal.App.2d at p. 138; see *People v. Carpenter* (1997) 15 Cal.4th 312, 353.) When read in context, the effect of the trial court's challenged comments in this case were clearly not to "discredit the defense or create the impression it [was] allying itself with the prosecution." (*Ibid*.) We see no evidence in the record that the trial judge " ' "officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecutor." ' " (*People v. Harris* (2005) 37 Cal.4th 310, 347.) Rather, to maintain control of the proceedings, the trial court had to sometimes admonish defendant in the presence of the jury when his conduct warranted reprimand. (*Dickenson*, *supra*, at p. 138 ["events happen rapidly during the course of a trial"].)

---

commentary of the nature described in those cases. For example, in *People v. Sturm* (2006) 37 Cal.4th 1218, the trial court's "behavior towards two key expert witnesses for the defense conveyed to the jury disdain for the witnesses and their testimony" (*id.* at p. 1240), and the court "interjected itself unnecessarily and inappropriately into the adversary process" (*id.* at p. 1243), "often made comments that were unnecessary to explain [its] rulings from the bench, and also substantively undermined the defense theory of the case" (*id.* at pp. 1238, 1243). In *People v. Mahoney* (1927) 201 Cal. 618, the trial court sua sponte examined witnesses and on numerous occasions made "frequent comment[s]" from which the jury could plainly perceive that the testimony of the witnesses was not believed by the court (*id.* at p. 627). In *People v. Zammora* (1944) 66 Cal.App.2d 166, the trial court accused defense counsel of repeatedly making unfounded objections, sarcastically referred to someone using ventriloquism to make defense counsel's statements for him, and accused defense counsel of sleeping (*id.* at p. 209).

In sum, whether viewed singly or collectively, the judge's comments in this case do not mandate reversal. The record evidences a trial court attempting to rein in a defendant who thought he could control what evidence would be put before the jury. The comments "did not discredit the defense theory, materially distort the record, withdraw material evidence from the jury's consideration, expressly or impliedly direct a verdict, or create an impression that the court allied itself with the prosecution." (*People v. Monterroso* (2004) 34 Cal.4th 743, 784 (*Monterroso*).) The jurors were informed they were not to take anything said or done by the court "as an indication" of what the court thought about "the facts, the witnesses[,] or what your verdict should be." The jurors were given instructions during the course of the trial as to how they were to consider defendant's statements when made while he was acting as his own counsel as opposed to his statements made as a witness. During the court's concluding instructions, reciting CALCRIM No. 222, the jurors were again informed that nothing said by the trial prosecutor or by defendant while acting as counsel representing himself is evidence. The jurors were also informed that it was not the court's "role to tell you what your verdict should be. Do not take anything [the court] said or did during the trial as an indication of what [the court] think[s] about the facts, the witnesses, or what your verdict should be." (CALCRIM No. 3550.) Defendant "offers no reason to believe the jury failed to follow" these instructions. (*Monterroso, supra*, at p. 784.)

## IV. Reversal Not Required Based on Cumulative Error

Defendant contends the combined effect of the claimed errors denied him his right to present a defense and resulted in prejudice. (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["[u]nder the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative

effect that is prejudicial"].) We conclude any purported errors, considered individually or collectively, were either without merit or not so prejudicial as to deny defendant a fair trial or reliable verdicts and sentences. (See *People v. Cain* (1995) 10 Cal.4th 1, 82 ["[d]efendant was entitled to a fair trial, not a perfect one"].)

## V. Reversal Not Required Based on Court's Denial of Motion to Reappoint Counsel Following Verdict

Defendant contends the trial court committed prejudicial error by denying his request to withdraw his *Faretta* waiver (*Faretta v. California* (1975) 422 U.S. 806, 807) after the verdict and have counsel reappointed to file a motion for a new trial and represent him at sentencing. We disagree.

We initially reject defendant's argument that the court's denial of his request to withdraw his *Faretta* waiver and for reappointment of counsel violated his Sixth Amendment right to counsel and therefore requires automatic reversal. In support of his contention, defendant cites to *Iowa v. Tovar* (2004) 541 U.S. 77 at pages 80–81 (*Tovar*), *Gideon v. Wainwright* (1963) 372 U.S. 335 at page 344, and *People v. Ortiz* (1990) 51 Cal.3d 975 at page 988. However, these cases do not address the narrow issue before us: whether a defendant has a constitutional right to have counsel reappointed following a valid *Faretta* waiver, which issue has not yet been decided by the high court. (*Marshall v. Rodgers* (2013) 569 U.S. 568 U.S. 58, 59, 64 (*Rodgers*).) In *Rodgers* the high court held that "in light of the tension between the Sixth Amendment's guarantee of the 'right to counsel at all critical stages of the criminal process,' [(*Tovar, supra*, at pp. 80-81)], and its concurrent promise of 'a constitutional right to proceed *without* counsel when [a criminal defendant] voluntarily and intelligently elects to do so, (*Faretta, supra*, 422 U.S. at p. 807)], it cannot be said that California's approach" –

25

which vests the trial judge with discretion when considering post-waiver requests for reappointment of counsel to either grant or deny the requests based on a totality of circumstances – "is contrary to or an unreasonable application of the 'general standard[s]' established by the Court's assistance-of-counsel cases." (*Rodgers*, *supra*, at p. 63.) Accordingly, we apply California law in determining the issue of defendant's entitlement to reappointment of counsel after a valid *Faretta* waiver.

In evaluating a defendant's request to withdraw a *Faretta* waiver and reappoint counsel, the trial court may consider what are known as the *Elliott* factors (*People v. Elliot* (1977) 70 Cal.App.3d 984, 993–994). These include: "(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth in the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney." (*Ibid*.) On appeal, we need not consider whether the trial court correctly listed the *Elliot* factors or "whether any one factor should have been weighed more heavily in the balance." (*People v. Lawrence* (2009) 46 Cal.4th 186, 188.) Rather, we review the record to see if, under "the totality of the circumstances," the trial court abused its discretion in denying defendant's request to withdraw his *Faretta* waiver and reappoint counsel. (*Ibid*.) "Buyer's remorse may not be an illegitimate reason for wanting to revoke a *Faretta* waiver, but neither is it a compelling one." (*Id*. at p. 195.)

In his written *Faretta* waiver signed before trial, defendant acknowledged he understood that he was "giving up having an attorney determine what post-trial motions and sentencing options" he might have if

26

he was convicted, and "to present those motions and options to the Court." After trial was completed on May 25, 2021, the trial court set a sentencing hearing for June 23, 2021, with the court noting that defendant had not waived time for sentencing. Two weeks later, on June 15, 2021, defendant filed a written motion seeking to withdraw his *Faretta* waiver and to have counsel appointed for sentencing, setting forth no reason for the request.

On appeal, defendant concedes he did not articulate in his written motion a reason for the reappointment of counsel but contends he did not do so because his need for counsel was "self-evident" and he believed the court would address the request. At the June 23, 2021 sentencing hearing, while the court was indeed prepared to consider defendant's request and he was given ample opportunity to present his reasons for the reappointment of counsel, he did not present any compelling reason for the court to grant the request. Despite his arguments to the contrary, the trial record reflects that defendant exhibited considerable knowledge of the law and trial tactics and proceedings. Further, as the trial court noted, he had previously been through a sentencing following his earlier conviction. Defendant made no claim he needed the assistance of counsel because he did not understand the intricacies of California law governing new trials, as the petitioner contended in *Menefield v. Borg* (9th Cir. 1989) 881 F.2d 696, 697. Further, there is no question that the reappointment of counsel would of course have significantly delayed the proceedings and, as part of his written request, defendant waived time for sentencing and asked for a continuance of 90 days.

When the trial court indicated it would not grant defendant's request to reappoint counsel, the record clearly reflects that defendant was prepared to represent himself as to both the motion for a new trial and sentencing. Defendant reported, for the first time, that he had not received a copy of the

27

probation report and informed the court that he prepared and wanted to file a written motion for a new trial and a sentencing memorandum with attached exhibits. The court gave defendant a copy of the probation report for his review and accepted for filing defendant's motion for new trial[7] and his sentencing memorandum with attached exhibits.

The court then recessed for one hour to allow defendant the opportunity to review the probation report while the court reviewed defendant's motion and sentencing memorandum. When the hearing resumed, the court stated it had read and considered defendant's written motion for a new trial and his sentencing memorandum and the attached exhibits. Defendant made no affirmative statement that he needed more time to review the probation report. The court proceeded to adjudicate both the written motion for a new trial (§§ 1179–1182) , as well as defendant's verbal request that it consider a non-statutory motion for a new trial. The court denied the motion for new

[7] In his motion, defendant contended he was entitled to a new trial because "the court in its rulings and conduct against defendant" deprived him of a fair and complete trial under the federal and state Constitutions. He also sought all trial transcripts based on necessity (to prove the court's errors and prejudice) and indigent status. However, he did not explain what specific issues he wished to raise in support of a motion for a new trial, which would necessitate the free production of any portion of the trial transcript. (See, e.g., *People v. Lopez* (1969) 1 Cal.App.3d 78, 83 [an indigent defendant "is not entitled, as a matter of absolute right, to a full reporter's transcript of his trial proceedings" for use in connection with a motion for a new trial; defendant must show a particularized need for the transcripts]; see also *People v. Markley* (2006) 138 Cal.App.4th 230, 243 [self-represented defendant's "belated receipt" of trial transcripts "was not due to any error by the court, but rather, to her own ignorance of the proper procedure by which to obtain the transcripts, and the untimeliness of her request" for the transcripts; "[b]y choosing to represent herself and thus forgo the assistance of counsel, [the defendant] assumed the risk of 'her own ignorance, and cannot rely upon the trial court to make up for counsel's absence,' " citing *People v. Barnum* (2003) 29 Cal.4th 1210, 1224].)

trial on the basis that there was sufficient evidence to support the conviction. The court then heard from both the prosecutor and defendant on sentencing. Hence, as reflected in the transcript, defendant was prepared and adequately represented himself as to both the motion for a new trial and at sentencing.

Accordingly, considering the totality of the circumstances, we see no abuse of discretion in the trial court's denial of defendant's request to withdraw his *Faretta* waiver and for reappointment of counsel to file a motion for a new trial and for sentencing.

Even assuming error, defendant has failed to demonstrate how he was prejudiced by the court's refusal to appoint counsel. Defendant does not explain what arguments counsel could have made in a motion for a new trial that would have been meritorious. (See *People v. Ngaue* (1991) 229 Cal.App.3d 1115, 1127 [court found the defendant's "speculative contentions" that "counsel might have perceived additional grounds for a new trial motion" were not sufficient to meet defendant's burden to show prejudice on appeal].)

Similarly, we see nothing in the record that demonstrates defendant was not prepared to represent himself at sentencing and that appointment of counsel would have likely led to a different result. Defendant contends that counsel would have presented defendant in a different light than he was able to present himself, providing a buffer between defendant and the trial court's lack of interest in anything defendant had to say. However, the record reflects differently. The trial court gave defendant ample opportunity to present his sentencing argument. The court's comments about not finding mitigating factors, read in context, meant that it found the described mitigating circumstances as presented during the trial and in defendant's sentencing memorandum and exhibits were not sufficient to outweigh the aggravating factors warranting the maximum sentence. (See *People v. Jones*

(1985) 164 Cal.App.3d 1173, 1181 ["while the trial court was obliged to consider the factors in aggravation as well as mitigation prior to sentencing [citation], it was not required to set out its reasons for rejecting mitigating factors"].)

Lastly, we see no merit to defendant's argument that had counsel been appointed the issue of victim restitution would have been fully addressed and likely challenged. The record does not reflect that defendant was not aware of or was not given an opportunity to lodge an objection to the victim restitution awards or request a hearing on the issue. The fact that defendant did not object to the victim restitution awards (thereby failing to preserve the issue for appellate review) does not demonstrate he was not prepared to represent himself at sentencing.

We therefore reject defendant's arguments that the presence of counsel would have resulted in a different sentence and awards of victim restitution and find that any judicial error in not reappointing counsel was not prejudicial.

## VI. No Basis for Resentencing Pursuant to 2022 Amendments to Section 1170, Subdivision (b) and Section 1385, and *People v. Tirado* (2022) 12 Cal.5th 688

Defendant was sentenced on June 23, 2021. He asserts because his case is not yet final on appeal, he is entitled to the presumption of retroactivity under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), and seeks resentencing under the 2022 amendments made to section 1170, subdivision (b) and section 1385 and *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*). We disagree.

## A.    Section 1170, Subdivision (b)

On January 1, 2022, Assembly Bill No. 24 (2021–2022 Reg. Sess.) became effective, which amended section 1170 regarding determinate sentences, making a low term sentence presumptively appropriate where specified circumstances are found to be "contributing" factors in the commission of the offense. (Stats. 2021, ch. 695, § 5.3.)[8]

The amendment to section 1170, subdivision (b) concerns only determinate sentences imposed under that statute. (§ 1170, subd. (b)(6)(A), (B).) Here the court imposed an indeterminate sentence for a murder conviction under section 190, plus a determinate sentence for the related firearm use enhancement under section 12022.53, subdivision (b). Accordingly, even if the new law for determinate sentences were to apply retroactively under *Estrada*, an issue we do not now decide, defendant would not be entitled to resentencing.

---

[8]    Section 1170 as amended reads, in pertinent part:
"(b)(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2). [¶] . . . [¶] (6) Notwithstanding paragraph (1), unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶](A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶](B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (§1170, subd. (b)(6)(A), (B).) For purposes of this provision, a youth includes a person who was under the age of 26 at the time of the offense. (§§ 1170, subd. (b)(6)(B), 1016.17; Stats. 2021, ch. 695, §§ 4, 5.)

## B.    Section 1385

Section 1385 was amended by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1), and further amended by Assembly Bill No. 200 (2021-2022 Reg. Sess.) (Stats. 2022, ch. 58, § 15).  The amendments added subdivision (c), which specifies factors that a trial court must consider when deciding whether to strike sentencing enhancements in the interest of justice. (*Ibid.*)  However, subdivision (c)  specifically provides: "This subdivision shall apply to all sentencings occurring **after January 1, 2022**." (*Id.*, subd. (c)(7); Stats. 2022, ch. 58, § 15(c)(7), bolded language added.)[9]

---

[9]    Before the 2022 amendments to section 1385, the section provided that a trial court could dismiss sentencing enhancements in the interest of justice. Senate Bill No. 81 (2021-2022 Reg. Sess.) amended section 1385 by adding subdivision (c), which provides in part: (1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." (Stats. 2021, ch. 721, § 1, subd. (c)(1),(2).)  The mitigating circumstances include that the application of an enhancement could result in a sentence of over 20 years; the current offense relates to mental illness or prior victimization or childhood trauma; and the defendant was a juvenile when they committed the current offense.  (§ 1385, former subd. (c)(3)(B); Stats. 2021, ch. 721, § 1, subd. (c)(3)(B).)  Assembly Bill No. 200 (2021-2022 Reg. Sess.) moved section 1385, former subdivision (c)(3)(A)-(I) to subdivision (c)(2)(A)-(I).  (Stats. 2022, ch. 58, § 15, subd. (c)(2)(A)-(I).) However, the Legislature did not make the 2022 amendments to section 1385 retroactive.  Senate Bill No. 81 added subdivision (c)(7) to section 1385, providing: "This subdivision shall apply to sentencing occurring after the effective date of the act that added this subdivision [i.e. January 1, 2022]." (Stats. 2021, ch. 721, § 1, subd. (c)(7).)  And, Assembly Bill No. 200 amended subdivision (c)(7) of section 1385, to provide: "This subdivision shall apply to

32

As a matter of statutory construction, the amendments apply only *prospectively* to the imposition of a firearm use enhancement imposed at a sentencing occurring after January 1, 2022. (See *People v. Flowers* (2022) 81 Cal.App.5th 680, 686, review granted October 12, 2022, S276237.) *Estrada*'s presumptive rule of retroactivity to cases not yet final does not apply as the Legislature has included an express saving clause in the new law providing only for prospective relief to those defendants sentenced after January 1, 2022. (*People v. Buycks* (2018) 5 Cal.5th 857, 881–882.) Because defendant was sentenced on June 23, 2021, six months before the new law became effective, resentencing is not required as the new law has no application to the sentence imposed on the firearm use enhancement.

## C.     *People v. Tirado* **(2022) 12 Cal.5th 688 (*Tirado*)**

In *Tirado,* our Supreme Court held that where the prosecution has charged and a jury has made a true finding of a firearm use enhancement under section 12022.53, subdivision (d), a trial court has the discretion to strike the enhancement and impose an uncharged lesser enhancement under section 12022.53, subdivision (b) or section 12022.53, subdivision (c). (*Tirado*, *supra*, 12 Cal.5th at pp. 697, 700–701).

We see no merit to defendant's conclusory argument that resentencing is required on the firearm use enhancement because the trial court did not have the benefit of the decision in *Tirado*, decided after sentencing in his case. *Tirado* decided the narrow issue of the scope of the trial court's discretion when the prosecution has alleged, and the jury has found true, facts supporting a firearm use enhancement under section 12022.53, subdivision (d). (*Tirado, supra*, 12 Cal.5th at p. 692.) *Tirado* did not address

---

all sentencings occurring after January 1, 2022." (Stats. 2022, ch. 58, § 15, subd. (c)(7).)

the issue presented here: when a firearm use enhancement under section 12022.53, subdivision (b) is alleged, and the jury has found true facts supporting that enhancement, may the trial court strike that enhancement and impose a lesser firearm use enhancement under section 12022.5, subdivision (a). Because "[i]t is axiomatic that a decision does not stand for a proposition not considered by the court" (*People v. Dickey* (2005) 35 Cal.4th 884, 901), and defendant does not offer a cogent argument as to why *Tirado* should be applied in this case, we do not further address the matter. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*) ["citing cases without any discussion" as to why the cases should be followed "results in forfeiture" of the appellate claim].) [10]

_____

[10]     In light of defendant's deficient opening brief, the Attorney General does not address any potential applicability of *Tirado*, and notes only that on September 28, 2022, our Supreme Court granted review in an unpublished decision in *People v. McDavid* (*McDavid*), which presents the following issue: "Where a Penal Code section 12022.53 enhancement is found true, may the trial court strike the section 12022.53 enhancement and impose a lesser enhancement under section 12022.5?" (See *People v. McDavid* (July 14, 2022, D078919) [nonpub. opn.], review granted and request to publish denied Sept. 28, 2022, S275940.) In his reply brief, defendant informs us that since *Tirado*, published cases have held that a trial court has discretion to impose a lesser uncharged firearm use enhancement under section 12022.5, subdivision (a) when it exercises its discretion to strike a firearm use enhancement under section 12022.53, subdivision (b). (See *People v. Johnson* (2022) 83 Cal.App.5th 1074 (*Johnson*), review granted December 14, 2022, S277196, holding for *McDavid,* and *People v. Fuller* (2022) 83 Cal.App.5th 394 (*Fuller*), review granted November 22, 2022, S276762, holding for *McDavid*.) However, defendant fails to inform us that at least one court has held to the contrary, specifically holding that when a section 12022.53 enhancement has been admitted or found true, the trial court lacks discretion to strike that enhancement and impose a lesser enhancement under a statute outside of section 12022.53, i.e. under section 12022.5, subdivision (a). (*People v. Lewis* (2022) 86 Cal.App.5th 34, 41.) More significantly, in his reply brief, defendant once again fails to present any argument as to why we should follow *Johnson* and *Fuller*. Accordingly, we see no reason to further

34

In any event, we see no merit to defendant's argument that had the court been aware of *Tirado*, it might have imposed sentence for a "lesser included enhancement" for personal use of a firearm under section 12022.5, subdivision (a), instead of the enhancement for personal use of a firearm under section 12022.53, subdivision (b).

A remand is necessary when the record shows the trial court proceeded with sentencing under the erroneous assumption it lacked discretion in its sentencing decisions. (See, e.g., *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) However, "the egregiousness of a defendant's crimes, a defendant's criminal history, and the court's sentencing options and rulings may prompt the court to express its intent to impose the maximum sentence permitted. When such an expression is reflected in the appellate record, a remand would be an idle act because the record contains a clear indication that the court will not exercise its discretion in the defendant's favor." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 427; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [remand for resentencing unnecessary where the trial court indicated it would not, in any event, have exercised its discretion to lessen the sentence and imposition of the maximum term was well within the trial court's sentencing discretion].)

At the sentencing hearing, the trial court extensively detailed its reasons for imposing the maximum term possible under the law. The court specifically considered and noted some of the information in the prosecution's sentencing memorandum, the probation report, information concerning the victim's family members, defendant's sentencing memorandum that his

---

address the issue, which will be decided by our Supreme Court. (See *Allen*, *supra*, 234 Cal.App.4th at p. 52 ["[c]iting cases without any discussion" as to why the legal authority should be followed "results in forfeiture" of the appellate claim].)

35

former counsel had filed in 2018 and letters of support for defendant "updated from 2020," some newspaper articles discussing defendant and an essay written by defendant. After adopting the probation department's recommendations of several factors of aggravating circumstances and no factors of mitigation under the rules of court, the court stated: "Based upon this record, . . . I believe he's unrepentant. He murdered this young man for no reason. He's an unrepentant, evil person and indifferent to human life and value and a continuation of prior violent criminal conduct. He's a great risk to the community, and I find no mitigating factors in this case. [¶] I find that the only just punishment in this case to be the maximum term which would be state prison. [¶] . . . He's sentenced to 15 years to life for the second degree murder. He will further be sentenced to an additional 10 years on the gun charge. I'm aware of the enhancement and that I have the authority and discretion to impose a gun use or strike it in this matter *or lessen it*," but "considering the facts in this case, as set forth in the sentencing hearing, this Court imposes the gun use term and *would impose no other term under any circumstances*." (Italics added.)

Given the court's statements at sentencing, a remand would be an idle act, and we decline to order it.

## VII. California Racial Justice Act (Section 745) Request for Disclosure Should Be Reconsidered in Light of New Case Law and Statutory Amendments

During the trial court proceedings, defendant filed a request for disclosure of records in the possession or control of the district attorney to assist him in filing a motion for substantive relief under section 745, known as the California Racial Justice Act of 2020 (Assem. Bill No. 2542 (2019–2020

36

Reg. Sess.); Stats. 2020, ch. 317, §§ 1, 3, 3.5; "CRJA".). Defendant challenges an April 20, 2021 order denying his request for disclosure.

At the time the trial court issued its April 20, 2021 order, it did not have the benefit of *Young v. Superior Court* (2022) 79 Cal.App.5th 138 (*Young*), in which our colleagues in Division Four announced, in a case of first impression, the legal standard to apply when deciding whether a defendant has shown good cause for requested disclosure under the CRJA (*id.* at p. 169) and discussed factors relevant to the good cause showing (*id.* at pp. 166–169). Moreover, the Legislature has since amended section 745 to clarify terms used in the statute and provide further guidance in interpreting the statute. (Stats. 2022, ch. 739, § 2, eff. Jan. 1, 2023.)

Accordingly, under these circumstances, we deem it appropriate to reverse the April 20, 2021 order. On remand, we shall direct the superior court to reconsider defendant's section 745 request for disclosure in light of *Young, supra,* 79  Cal.App.5th 138 and the new amendments to the statute.[11]

[11] In light of our determination, we deny as moot defendant's request for judicial notice of a March 28, 2021 report entitled, *In(Justice) in Alameda County: A Case of Reform and Accountability*, which was issued by the ACLU and Urban Peace Movement. (See *Miller v. Zurich American Ins. Co.* (2019) 41 Cal.App.5th 247, 255, fn. 5 [request for judicial notice denied as moot as documents were not necessary to resolve appellate issues].)

In connection with this appeal, defendant has also filed in this court motions for injunctive relief under Code of Civil Procedure section 527, seeking an order directing the district attorney to keep accessible the requested records for disclosure. Petitioner contends an order is necessary because the requested records may be removed or destroyed due to personnel changes in the Office of the Alameda County District Attorney related to the election of a new Alameda County District Attorney. Respondent opposes the request on the basis that an order is not necessary to preserve the requested records. As the new Alameda County District Attorney took office in January 2023, and there is no indication that injunctive relief is necessary at this time, the motions for injunctive relief are denied without prejudice to renewal in the superior court if there is a change in circumstances.

**DISPOSITION**

The judgment of conviction is affirmed.  The April 20, 2021, order denying defendant's request for disclosure under Penal Code section 745 is reversed and on remand the superior court is directed to reconsider the request for disclosure consistent with this opinion.[*]

---

[*] In connection with this appeal, defendant has also filed a petition for writ of habeas corpus, *In re DeAngelo A. Cortijo*, case No. A164662.  We have denied the petition by separate order filed this date.

_____
Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Rodríguez, J.


A162926/*People v. Cortijo*